OPINION. Turner, Judge: The first question is the basis to petitioner for depreciation or amortization of the patents and applications for patents which were among the assets acquired by it from National Dairy in exchange for its capital stock. The parties are agreed that the basis therefor in the hands of petitioner is the cost to National Dairy of the patents and applications for patents in the transaction whereby National Dairy, in a lump-sum or package deal, acquired the business and assets of Kraft (Ill.). The facts show that the consideration so paid by National Dairy in the acquisition of the assets and business of Kraft (Ill.) consisted of the assumption of liabilities in the amount of $2,801,148.72, and other consideration consisting of stock, debentures, and cash amounting to $78,338,412.84. In short, our first question is to determine what part of the consideration stated properly represented the cost to National Dairy of the Kraft patents and applications for patents. In its petitions the petitioner alleged that the cost of the patents herein to National Dairy was $31,373,716.25. On brief, its claim now is that such cost was at least $20,000,000. It is the claim of the respondent that the amount allocable as the cost of the patents did not exceed $2,530,000. The record is replete with evidence covering the manufacture, processing, and marketing of cheese and cheese products, the growth of Kmft. in that business, the introduction on the market of processed cheese, as contrasted with natural cheese, the development and improvement of the methods of processing, the machinery required and utilized therein, as well as the equipment for the packaging of the product for the retail trade. The history of the patents and the dates and manner of their procurement are quite fully shown. There is also of record, on behalf of the petitioner, a detailed computation made by its comptroller, showing the conclusions as to unit costs, unit sales, and unit net profits of the various products produced and sold by Kraft and by petitioner, both patented and unpatented, for the years 1929 through 1948. In making these computations, the witness started with book figures and then exercised his own judgment as to the proper allocation to the particular products of administrative and other costs not theretofore taken into account in arriving at gross profit. The books themselves contained no entries designed to reflect such allocations or the unit net profits. In the course of the trial, the petitioner called numerous witnesses, beginning with J. L. Kraft, the founder of the original Kraft business, designed to show the growth and development of the business and the role of the patented processes and apparatus in that growth and in the conduct of the business at the time of the sale to National Dairy. Thereafter, it called one witness as an expert to give his opinion as to the portion of the total lump-sum price paid by National Dairy for the Kraft business and assets which should be regarded as the amount paid for the patents and applications for patents. In addition to several witnesses who gave testimony as to the manufacture and production of cheese, largely with respect to cream cheese, the respondent’s testimony was from four witnesses. The first of these was an employee of the Bureau of Internal Revenue, in its engineering and auditing section, who had prepared schedules, first from the balance sheet of Kraft (Ill.), and second according to the consolidated balance sheet of Kraft (Ill.) and its subsidiaries. The first was to show the assets of Kraft (Ill.) according to its books, both tangible and intangible, and finally its net tangible assets; and the second was to show similarly the assets of Kraft (Ill.) and subsidiaries on a consolidated basis. He also presented his tabulation of the lump-sum cost to National Dairy of the Kraft assets and business by taking bonds and debentures at par plus interest, cash and other amounts paid in cash at the stipulated figures, and the stock at the high and low for sales made on the date of the sale herein. The second of respondent’s witnesses was a practicing patent attorney, a former naval officer, who, during the recent World War, had devoted his time and attention to patent problems encountered by the Navy in the prosecution of the war. In his testimony, he gave his analyses of many of the Kraft patents, most of his testimony being directed to the mechanical patents, which included the cheese cookers, so-called, and the packaging machinery patents. In the course of his testimony and by referring to what he termed the carrying phrases in the various patents, he pointed out that many of the patents were what are sometimes referred to as patents in combination, wherein various of the elements are not novel but their use in combination is novel to the extent that they present an apparatus or device regarded by the United States Patent Office as patentable and upon which patents are issued. As to a number of these patents and on the basis of his analyses thereof, he expressed the opinion that they were of limited value, in that as to many of them the use in combination was such as to give the patents what he termed merely a defensive value, which value from a comparative standpoint was negligible. As to others, he found what he termed to be an assertive value. This value was attributable to something more than a mechanical combination of elements, the use in combination being such as to give affirmative value to the patents. The third witness was called as an expert to present the results of a study made by him of acquisitions by food companies of similar or comparable concerns during the years 1928 and 1929 and the first 6 months of 1930, and to testify with respect thereto. In his studies, made on the basis of available statistics, he gave particular attention to the consideration paid in the course of such acquisitions for tangible and intangible assets. The respondent’s fourth witness was an engineer of long service in the Bureau of Internal Revenue, who, on the basis of his opinion of their similarity “in nature,” divided the patents into nine groups. By way of illustration, the first group contained the processing and blending patents. The fourth group contained the patents relating to cooking apparatus. In group seven were the patents relating to the cream cheese wrapping machine. Schedules showing his tabulation or mathematical computation of the remaining lives of the patents by groups were placed in evidence. He also presented a schedule which in his opinion disclosed the value of the patents in group one on the basis of the royalties under the licensing agreements covering those patents. Relying heavily on the testimony of his witness called as an expert on patents, and on the valuation of the so-called processing or group one patents, arrived at by computations based on the royalties paid under licensing agreements covering those patents, the respondent makes his claim that the amount allocable as the cost of the patents and applications for patents did not exceed $2,530,000. The objective here, however, is not to analyze the patents in combination in order to find and determine the relative technical merits of the separate or individual parts, nor to arrive at the value of such individual parts separately. Neither is it our purpose to determine what the value of the patents might have been if the owner had been limited in their use to mere licensing for the purpose of collecting such royalties as might have been obtainable. Here, the patents were part and parcel of the assets of the Kraft enterprises, a going business, and it is with them in that posture that we are concerned. Furthermore, we are interested in the fair market value of the patents at the time of purchase only insofar as such fair market value may be indicative of the portion of the lump-sum purchase price of Kraft’s business and assets as may reasonably and properly be regarded as having been paid for the patents. The respondent has not, in our opinion, given due regard to the problem in that aspect, and we are unable to conclude that the amount properly to be regarded as the cost of the patents did not exceed the $2,530,000, as he contends. The $20,000,000 figure now claimed by petitioner is an acceptance of the opinion of its witness, called as an expert, as to the portion of the lump-sum price paid by National Dairy for the Kraft business and assets which should be regarded as the amount paid for the patents and applications for patents. This witness was the only witness for petitioner testifying to any fixed or dollar amount which should be regarded as the amount so paid. While we have no doubt that the above witness was a man of wide experience in his field, namely, that of acting as business consultant, his testimony here was not impressive or convincing. He had listened to the testimony of J. L. Kraft, and of Mclnnerney who had acted for National Dairy in the above purchase, and had reviewed “a good many documents” and the record of the trial which had been made prior to his appearance on the stand and when he was not present. He arrived at his opinion of value by what might be termed a process of elimination. He noted that in the contract of purchase “an earnings base of $5,000,000 was agreed upon for the purpose of that transaction.” He concluded on the basis of his studies of the business and the book assets that a value of 12 times earnings, or $60,000,000, was reasonable. He noted, however, that the price actually paid was approximately $80,000,000, and looking for something to which he might attribute the $20,000,000 of the purchase price over and above the $60,000,000, arrived at as indicated, he decided that the patents, which were not among the book assets, accounted for the additional $20,000,000 of the purchase price. He had heard or reviewed certain of the testimony, as indicated above, but he had made no study of the patents personally, or arrived at any conclusion as to the use or device of the patents in the Kraft business. He had skimmed through them, but they meant nothing to him particularly. And, when being questioned on cross-examination with respect to his choosing of the ratio of earnings to value, he testified that in 1929 and the early part of 1930 “very many” food companies were being purchased at amounts exceeding 12 times their earnings. He also testified that he had had occasion to look at food companies and dairy companies and was of the view that ordinarily they did not have patents. Having carefully observed the witness, listened to, examined and considered his testimony, we are unable to conclude that it supplies an adequate basis for finding that $20,000,000 of the total purchase price paid by National Dairy for the business and assets of Kraft (Ill.), or any other particular amount, is the amount properly allocable as the cost to National Dairy of the patents and applications for patents acquired in the transaction. In the circumstances stated, we are left to determine as best we may, from the background evidence, whether the cost of the patents to National Dairy was reasonably the $20,000,000 contended for, or some lesser amount. Certainly we find no justification in the testimony of Mclnnerney, president of and negotiator for National Dairy, for any conclusion that the amount properly allocable as the cost of the patents was anything like $20,000,000. While he did testify at one point that he knew of the patents, attached a great deal of importance to them, and would not have bought the business if the patents had been excluded, his concluding statement on direct examination was more revealing, we think, of what he had in mind. It was that the patent rights played an important part because they gave, or would give, the business “a little edge against competition.” We are satisfied that he did regard the ownership of the patents as being important; but his testimony, as we heard it from him, falls far short of justifying a conclusion that $20,000,000, or, to put it differently, that approximately 25 per cent of the total purchase price of the business and assets of Kraft (Ill.), was paid for the patents. While.there can be no question, we think, that the patents constituted an important part of the Kraft assets as they were acquired by National Dairy, we are of the view that the respondent is justified in his position that the patents themselves were a much lesser factor in the Kraft business and operations and in the purchase thereof by National Dairy than the petitioner claims. The evidence of record very definitely shows that the development and advent of effective and successful methods of processing and blending natural cheese practically revolutionized the cheese business, but a patent and the rights thereunder are not synonymous with the method or process covered thereby. See Patterson v. Commonwealth of Kentucky, 97 U. S. 501, 507, wherein the Supreme Court quoted with approval from an opinion of the Supreme Court of Ohio as follows: Although the inventor had at all times the right to enjoy the fruits of his own ingenuity, in every lawful form of which its use was susceptible, yet, before the enactment of the statute, he had not the power of preventing others from participating in that enjoyment to the same extent with himself; so that, however the world might derive benefit from his labors, no profit ensued to himself. * * * The sole operation of the statute is to enable him to prevent others from using the products of his labors except with his consent. But his own right of using is not enlarged or affected. * * * Along the sarnie line, Chief Justice Taney, in Bloomer v. McQuewan, 14 Howard 539, at page 548, had previously said: The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent. * * * With few exceptions, the patents here covered processes and apparatus which were of value or important because they were improvements or expansions of the methods covered by the processing and blending patents or supplied practical and economical devices and apparatus for their exploitation.[14] For instance, the cookers and the packaging device for hard cheeses would have had little apparent utility but for the discovery and development of the method whereby the cheese, when heated, would remain in a homogeneous, cheese-like mass during and after the processing. Such dominance over the group of patents as a whole by the early processing and blending patents, the first of which was to expire in 1933, is, therefore, a very important factor in arriving at the role played by the patents in the Kraft operations and in determining their cost to National Dairy. In that connection, the testimony of J. L. Kraft was quite revealing. From his testimony, it is reasonable to conclude that Kraft was never so much interested in a substantial or full exercise of its rights under the patents, as it was in getting the resulting commodities to the consuming public. In the first place, the processing operations, according to his testimony, were simple enough to invite widespread infringement, and very shortly controversy arose between Kraft and Phenix, which were then separate enterprises, as to who was infringing whose patents. This altercation was settled by agreements providing for cross-licensing. By 1925, Kraft and Phenix decided that it would be good business policy to license the processing patents[15] to responsible manufacturers, not with the revenue to be derived from the royalty as the moving factor, but for the purpose of obtaining the support of such manufacturers for the processed products and for the purpose of educating the public to the qualities thereof through wider distribution. This course was feasible in the opinion of J. L. Kraft for several reasons. The volume of available and potential business was such that Kraft could not possibly have acquired either sufficient raw material, manufacturing capacity, or sales or delivery capacity to supply the demand. He was also of the view that, even with the competition that such a plan would afford, Kraft had the ability and capacity to attain and hold a dominant position in the cheese producing and marketing field to the extent that it could develop sources of raw material, finance and expand its manufacturing capacity, and build up and improve its sales, delivery, and other marketing operations. J. L. Kraft himself quite aptly illustrated the soundness of the course taken, when he pointed out that even though Kraft had failed in its efforts to obtain patent protection in England for its cheese processing methods it nevertheless became the largest manufacturer and dealer in processed cheese in Great Britain, and in Australia its business progressed to such a point that it was doing better than 50 per cent of the Australian processed cheese business. As being indicative of great value in the processing, blending, and boxing patents and in the Eldredge Patent No. 1,634,410, the petitioner puts great emphasis on Yelveeta. Velveeta is what is commonly referred to as a cheese food, and results from the processing of carefully selected cheddar cheese and, in the course of such processing, the addition of condensed whey and other ingredients. It was introduced to the trade in 1928 and became one of Kraft’s, and thereafter one of petitioner’s, most popular and profitable products. The development of Velveeta followed the procuring in 1927 of a license under the above Eldredge patent from Pabst Corporation. Pabst had been producing a processed bulk cheese product known as Pabst-ett, which was made from blended cheddar cheese, with the addition, among other things, of condensed or concentrated whey, and had been sued by Kraft for infringing its processing, blending, and boxing patents. The court held that the Kraft patents had been infringed and handed down a decision to that effect. Thereafter, following the decision of the court, Kraft and Phenix granted licenses to Pabst under the above Kraft patents and under the blending and processing patents then belonging to Phenix, and Pabst granted a license to Kraft and Phenix under the Eldredge Patent No. 1,634,410. Following the licensing of the patent, Kraft produced and brought out a cheese food by the name of “Nukraft,” purportedly under the Eldredge patent, to compete with Pabst-ett. Nukraft, although widely advertised, was a failure as a commercial product, and its production was discontinued. After further research Kraft changed the Nukraft formula and brought out the cheese food Velveeta. In the light of the court decision above, we think it reasonable to conclude that the processes and devices covered by the above Kraft patents and most likely the methods of processing covered by the Phenix patents were and are utilized in the production of Velveeta. Furthermore, to the extent that we may assume that the addition of whey and other ingredients, whatever they may be, is covered by the Eldredge patent, the processing of Velveeta is within the scope of that patent. We are unable to conclude, however, that the full value to be drawn from Velveeta is attributable solely to the patents in question. As indicated, the record is plain and definite that Velveeta is produced according to a secret formula. A secret formula or trade secret is quite the opposite from a process covered by a patent and to the extent that value is attributable to the secret formula, it may not be attributed to the patent. And in the absence of a showing that the success of Vel veeta was due wholly to the use of the patented processes, as against its manufacture under the secret formula, tve are unable to attribute value to the patents involved from the production of Yelveeta to the extent claimed by the petitioner. Nukraft, insofar as appears, was wholly within the Eldredge patent but, as indicated, was not a success and was abandoned. Vel veeta, at least insofar as the end product was concerned, was apparently something different, in that it was brought out after further research following the failure of Nukraft. The formula was a new formula which was and has continued to be secret. With respect to the whey processing patents, we have encountered a somewhat comparable difficulty. At May 21, 1930, Kraft had rights in processes covered by the applications for patents by Eldredge and Simmons, although the rights in Simmons’ application had to be settled thereafter by litigation. At or about the same time, Peebles, Manning, and Western Condensing Company were likewise applying for patents covering methods for processing whey. In 1931 petitioner, on the one hand, and the parties mentioned, on the other, entered into a cross-licensing agreement. If we have read the petitioner’s argument aright, it is that the process covered by the Simmons patent dominated the whey processing field and the Simmons application for patent at May 21, 1930, when the rights thereto were acquired by National Dairy, is to be valued accordingly. For corroboration, it points to the subsequent growth of petitioner’s whey processing business. We have been unable to conclude that the record is as definite and clear in that respect as petitioner’s argument indicates. There is testimony that during some of the time, if not all of the time, whey processing was carried on by petitioner under the method covered by the Peebles patent. The record is not clear as to the extent to which the petitioner’s whey processing operations as were thereafter carried on, were under the Simmons, as against the Peebles, processing method. The above is not to say, however, that Kraft, in its efforts to popularize its product by a rather free and liberal licensing policy[16] under its patents, surrendered, or had any intention of surrendering, the patents to public use, as in the case of the Dahlberg patent, or that it did not profitably utilize its patents or rights thereunder in its business. As previously noted, one of the rights under a patent is the right of choosing those who may be licensed and the extent of the use granted. In the main, at least, Kraft granted its licenses to the more responsible cheese manufacturers, namely, those who could best further its purposes. Furthermore, there can be no question that its prior ownership and continued ownership of the patents were factors which contributed substantially to its development ahead of its competitors, and at the time of the sale was contributing to its maintenance of that dominant position in the cheese manufacturing and marketing field. While we have set forth much of the background or foundation facts, it has not been feasible to recite many such facts. We have carefully studied and considered all of the evidence of record as presented by both the petitioner and the respondent, and after such consideration, it is our opinion, and we conclude that of the lump-sum purchase price paid by National Dairy for the Kraft business and assets, $8,000,000 was the amount paid for the patents and applications for patents. The remaining difference between the parties as to patents is over the method of computing the annual allowance for depreciation or amortization thereof. Both parties apparently agree that where the cost or other basis of a patent is known, or may reasonably be determined, the correct method would be to prorate or spread such basis over the remaining life of the patent. Neither seeks to use that method here, however, since they are also in apparent agreement that the cost basis of each patent individually cannot be determined. The petitioner, although making some computations of value for various patents or groups of patents upon the basis of amounts constructed by it as the earnings attributable thereto, argues that the patents were such an integrated part of the business and assets of Kraft, and later of petitioner, that there is no practical or sound method of finding and determining the value of the patents individually; and in the absence thereof, the best or most reasonable method is to compute the number of days of unexpired patent life at the beginning of the taxable years for all patents and the number of days of remaining life expiring in each taxable year for all patents and then apply the precentage which the latter figure is of the former to the basis for all patents, to arrive at the amount of the deduction. It points out that this method was approved and followed by this Court in disposing of a similar question in Simmons Co., 8 B. T. A. 631. It argues further that such a method is within the scope of the respondent’s regulations and sound accounting principles.[17] The respondent, on the other hand, while criticizing the petitioner’s method for computing the annual depreciation or amortization allowance, and pointing out that the correct method is by spreading the cost or other adjusted basis of each particular patent over the years of its remaining life, has in principle adopted a method which is open to the same criticism he has directed toward petitioner. Instead of making a determination of the adjusted basis for each individual patent and computing the depreciation allowance over the remaining life thereof, he contends for a determination of basis of the patents by groups and for a depreciation allowance over the remaining period representing the average of the lives of the patents in the particular group. Theoretically there is some justification for grouping the patents as the respondent seeks to do, in that such a course would be one step closer to a determination of the depreciation or amortization allowance on the patents individually, and further, the patents in at least two of the groups, and petitioner so admits,- do constitute functionally related groups. The difficulty is, however, that in the instant case we find no better basis for determining the cost of the patents by groups than for determining their costs individually, which latter determination respondent, on brief, states cannot be done. The statute, section 23 (1) of the Revenue Acts of 1934, 1936, and 1938, goes no further than to provide for the deduction of “a reasonable allowance for exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.” A taxpayer is not restricted to any specific method of computing the depreciation allowance, however, the only requirement being that the allowance, when computed, be a reasonable allowance. With reference to patents, article 23 (1) -1 of Regulations 86, 94, and 101 states that the allowance “should be computed by an apportionment of the cost, or other basis of the patent” over its life. With respect to the method of computation, article 23 (1) -5 of the said regulations provides, “Whatever plan or method of apportionment is adopted must be reasonable and must have due regard to operating conditions during the taxable period. The reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made. * * * The deduction for depreciation in respect of any depreciable property for any taxable year shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis.” On the facts here, we think that the method of computing the depreciation or amortization allowance contended for by the petitioner is the most reasonable advanced, and we have been unable to discover any method which is more reasonably applicable to this case. We have been able, on the evidence, to determine the cost of the patents as a group and we agree with the parties that it is not possible to determine the cost of each patent separately. It is undoubtedly true, as the respondent suggests, that some of the patents are worth more than others, and, such being the case, those patents would be regarded as having a greater cost than others and having a greater cost, the depreciation or amortization allowance would be correspondingly greater. In the circumstances here, however, it is not possible to determine within the group, particularly those which are functionally related, where the scope of one patent ends and the other begins. Rather obviously, there is an overlapping and the second or third patent would not have been what it was except for matters covered by those which preceded it. We are accordingly of the opinion that the computation of the depreciation or amortization allowance on the patents as a group is fair and proper and that the life of the group in each particular year is fairly and reasonably shown according to the method advanced by the petitioner and covered in our Findings of Fact. Noting, however, the provisions quoted above from article 23 (l)-5 of the regulations, that the allowance shall be determined upon the conditions known to exist at the end of the taxable period, the parties are directed in their computations to eliminate Patent No. 1,258,438, since the findings show that although included among the patents, title to which passed to National Dairy on May 20, 1930, this patent had no value and had proved of no value since that time. The remaining issue is as to the correctness of the respondent’s dis-allowance of interest deductions claimed by petitioner. It is the petitioner’s contention that the amounts in question represented interest paid annually pursuant to $30,000,000 of valid and subsisting debentures or evidences of indebtedness outstanding in each of the taxable years. If we read them aright, the respondent’s claims in substance are that the issuance of the said instruments did not create a debtor-creditor relationship, that the interest of National Dairy in petitioner was, and continued to be a stock interest, and that the payments in question, although made under the guise of interest, represented the distribution of petitioner’s earnings and profits to its one stockholder, namely, National Dairy. Subject to an exception, not here pertinent, section 23 (b) of the Internal Revenue Code provides for the deduction of “all interest paid or accrued within the taxable year on indebtedness.” With respect to the words “interest” and “indebtedness” as used in that section, the Supreme Court, in Deputy v. Du Pont, 308 U. S. 488, had the following to say: We are dealing with the context of a revenue act and words which have today a well-known meaning. In the business world “interest on .indebtedness” means compensation for the use or forbearance of money. In the absence of clear evidence to the contrary, we assume that Congress has used these words in that sense. * * * Unlike many of the decided cases, we do not have here a case in which the instruments involved had some of the characteristics of both debentures and certificates of stock and the problem has been to determine which they were. In the instant case, all of the requirements of form and ritual necessary to make the instruments debentures were meticulously met. They were either evidences of indebtedness and effective as such, or, being purely ritualistic and without substance, were futile and ineffective to make the annual payments interest. See and compare John Kelley Co. v. Commissioner and Talbot Mills v. Commissioner, 326 U. S. 521; Commissioner v. Hood & Sons, Inc., 141 F. 2d 467; Ruspyn Corporation, 18 T. C. 769; Lansing Community Hotel Corporation, 14 T. C. 183; New England Lime Co., 13 T. C. 799; Toledo Blade Co., 11 T. C. 1079; Swoby Corporation, 9 T. C. 887; 1432 Broadway Corporation, 4 T. C. 1158; Clyde Bacon, Inc., 4 T. C. 1107; Proctor Shop, Inc., 30 B. T. A. 721, affd. 82 F. 2d 792; and O. P. P. Holding Corporation, 30 B. T. A. 337, affd. 76 F. 2d 11. Belying heavily on the fact that the issuance of the debentures was a transaction between a parent company and its wholly owned subsidiary and the further fact that the debentures brought no new money into the business, and contending that their issuance served no business purpose but that the sole purpose was a tax-saving purpose, whereby petitioner could distribute its earnings to its sole stockholder in the guise of interest, that the ratio of the so-called debentures to capital stock was so disproportionate as to make the transaction unrealistic, and further, that there is no evidence here of a genuine intention to create a debt, the respondent concludes that the transaction did not result in the creation of an indebtedness, but that, for all practical purposes, the interest of National Dairy in petitioner remained the same as before the issuance of the debentures. As proof of its claimed indebtedness to National Dairy, the petitioner, for all practical purposes, rests its case on the resolution of its board of directors that it “hereby declares out of the surplus of this Corporation a dividend of $30,000,000.00,” and on the terms of the debentures issued thereunder, its argument with respect to the latter being that the terms “of the debentures so clearly demonstrate that petitioner intended to create and did create true indebtedness that those terms alone are more than enough to satisfy petitioner’s burden of proof.” The remainder of its argument, in the main, is negative in character, such as, the debentures were not invalid because petitioner had only one stockholder;[18] the debentures were not invalid because simple in form; the debentures were not invalid because assets were not distributed pursuant to the declaration of the “dividend”;[19] the debentures were not invalid because they were charged to paid-in surplus;[20] they were not invalid because they brought no new capital into the business;[21] they were not invalid because a tax advantage “may have accrued from their issuance”;[22] and whether their issuance served a business purpose, is not a test of the deductibility of interest thereunder.[23] While it may be sound law that the declaration of a dividend creates a debt and gives rise to a debtor-creditor relationship between a corporation and its stockholders, as petitioner argues, the declaration, to be effective, must be supported by an intent that it be so and that the dividend be paid. The formality of declaration alone is insufficient. See the discussion in Maverick-Clarke Litho Co., 11 T. C. 1087, as to the declaration and payment of a dividend by a corporation whose stock was closely held. As to the dividend in the instant case, we agree with the respondent that the only purpose shown for its declaration or the issuance of the debentures which followed was a tax-saving purpose. Petitioner does make some argument that a business purpose was indicated in the issuance of the debentures and that substance was imparted to the transaction by the fact that National Dairy, in its acquisition of the Kraft business and assets some 4 years earlier, had paid $33,264,500 of the purchase price in its 5^4 per cent gold debentures, which debentures were still outstanding. From this, it is argued that since the business and assets so acquired by National Dairy from Kraft had become the business and assets of petitioner, a business purpose was served by having petitioner similarly obligated to National Dairy in a somewhat comparable amount. Aside from the argument itself, the record is devoid of any proof showing that the situation described prompted or brought about the issuance of the debentures herein; or, if so, the reason why they were not issued some 4 years before they were. Furthermore, it is not readily apparent just how the issuance of the debentures by petitioner, merely because its parent company had debentures outstanding, would serve a business purpose for petitioner. The petitioner’s minutes show only that the chairman of petitioner’s board of directors presented a balance sheet as of May 31, 1934, showing a surplus, according to the books, of $31,324,384.14 and suggested that a dividend be declared and paid to its stockholder out of such surplus, and that he then stated that it was desirable to conserve the cash position of the corporation and recommended that the dividend be paid in 6 per cent debentures, due February 1, 1948. In that connection, we agree with respondent that any matter appearing in the minutes which might convey the thought that there was ever any idea that such a dividend would be paid in cash, was purely “window dressing.” Except for the comparatively small amount of accumulated earnings and profits, the dividend would have had to be paid from surplus paid in at the time of petitioner’s organization, which surplus was and had continued to be in the form of assets regularly used and required in the business. To have paid the dividend in cash, without borrowing substantially the full amount, would have required the liquidation of a very substantial portion of the Kraft enterprises, and the possibility or probability that the Kraft business would have been liquidated for that purpose or money actually borrowed therefor, is, in our opinion, too remote for serious consideration. On the other hand, there is ample indication of a tax motive and, so far as appears, a purpose or motive to save taxes was the only purpose served. Until the tax situation changed in 1934 and National Dairy and its subsidiaries were no longer permitted to file returns on a consolidated basis, the then existing capital structure of the petitioner had, so far as shown of record, adequately and satisfactorily served its purposes. During all of the years of petitioner’s existence, up to and including 1933, the operations of National Dairy, after the exclusion of dividends received by it from domestic corporations, disclosed large net losses, which were available in the consolidated returns to substantially absorb the taxable income of petitioner and other subsidiaries. When the filing of consolidated returns was outlawed in 1934, there was no such advantage, since the dividends paid to National Dairy were not deductible by petitioner on its returns and National Dairy’s net loss could not be availed of as theretofore. To the extent, however, that the character of petitioner’s distributions to National Dairy should be changed from dividends to interest, it would have a deduction in computing its net income; and any interest received by National Dairy, even though taxable to it, could be absorbed to the extent of the loss which National Dairy would otherwise report on its return. It does not follow, of course, that the presence of a tax-saving purpose and the absence of a business purpose in the issuance of the claimed debentures requires or leads to the conclusion that a debtor-creditor relationship evidenced by valid and subsisting debentures did not arise between the parties. Commissioner v. Hood & Sons, Inc., supra; Lansing Community Hotel Corporation, supra; Toledo Blade Co., supra; and Cleveland Adolph Mayer Realty Corporation, supra. See also what was said in our opinion in John Kelley Co., 1 T. C. 457. That is not to say, however, that they are not factors to be considered in the over-all picture for the purpose of determining whether the creation of a debt was actually intended and whether a debt in truth did arise. And while we do agree that the petitioner had the legal right to rearrange its capital structure in the manner set forth, and as we have already noted, the instruments in question did meet the formal requirements of evidences of indebtedness and the facts further show that petitioner had ample and adequate surplus to supply the consideration for the issuance of the debentures, the answer to the question whether a debtor-creditor relationship did arise may not, on the record here, be so readily and simply derived. There was not, for instance, an arm’s-length transaction wherein the parties were unrelated or strangers, but a corporation-stockholder transaction. Furthermore, we do not have a case where the corporate stock was widely held, but that of a parent corporation and its wholly owned subsidiary, in which, as stated in Commissioner v. Transport Trading & Terminal Corporation, 176 F. 2d 570, the will of the parent is also the will of the subsidiary. What was said in 1432 Broadway Corporation,[24] supra, where the same question was presented, is equally to the point in this case. We there said: The debentures are in approved legal form, and, if their legal attributes alone were determinative of the character of the interest accruals, there would be little room for doubt that they were the indebtedness they purport to be. Cf. Clyde Bacon, Inc., 4 T. C. 1107. But, for tax purposes, their conformity to legal forms is not conclusive. Although a taxpayer has the right to cast his transactions in such form as he chooses, and the form he chooses will generally be respected, the Government is not required to acquiesce in the taxpayer’s election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. “The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statutes.” Higgins v. Smith, 308 U. S. 473. * * * Even where new money or property is needed in the business and is paid in to a closely held corporation, and where the book entries and the terms of the written instruments, because made or determined at or about the time the money or property was actually paid in, might more reasonably be expected to reflect the true character of the transaction, it has been found that such entries or writings may or may not be indicative of the character of the payments or advances as loans and that a debtor-creditor relationship has arisen with respect thereto. There must have been an intention that a debt should be created and that a debtor-creditor relationship, rather than a stock-bolder or proprietor relationship, should arise. Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F. 2d 718; Maloney v. Spencer, 172 F. 2d 638; Van Clief v. Helvering, 135 F. 2d 254; Erard A. Matthiessen, 16 T. C. 781; Isador Dobkin, 15 T. C. 31; Edward G. Janeway, 2 T. C. 197; and Daniel Gimbel, 36 B. T. A. 539. We have carefully examined and considered the evidence of record and the facts which may fairly be drawn therefrom, and we are not convinced that the creation of a debt or of a debtor-creditor relationship between National Dairy and petitioner under the claimed debentures was ever intended. To the contrary, we are persuaded by the evidence and the facts drawn therefrom that their relationship continued to be a stockholder-corporation relationship and that that relationship was not changed by the adoption of the dividend resolution and the issuance of the debentures thereunder. Aside from the fact that there was ample substance in petitioner’s assets to support the debentures, there is in our opinion the showing of nothing more than an indulgence in formalities, which include the dividend resolution, the form and formal issuance of the debentures, and the recording of the annual payments of 6 per cent on the books of the 2 companies as interest. There was, it is true, an actual payment by petitioner to National Dairy each year of the amount called for under the debentures as interest, but the payment could be taken or left, as National Dairy, the parent, saw fit. Furthermore, as long as consolidated returns were not permitted and it continued to disclose a net loss on its operations, exclusive of the dividends it received from domestic corporations, it was the same to National Dairy whether it took the payment as interest or as dividends. Subject to change in the situation, it could, so to speak, turn on the dividend tap or the interest tap, as expediency indicated. There is some corroboration of these conclusions in certain events occurring after the claimed debentures were issued. In 1941, when it became desirable to reduce the annual payments from 6 to 4 per cent, the reduction was accomplished by the formality of a simple written request by petitioner’s officers to National Dairy therefor. It is true that the request was purportedly bottomed on the fact that National Dairy had managed to procure a lower interest rate on its outstanding bonds and debentures and that petitioner accordingly considered it was entitled to a comparable reduction. It is to be noted, however, that National Dairy had for approximately 5 years been enjoying interest rates ranging from 3% per cent down to 2%o per cent, whereas petitioner had continued to pay the full 6 per cent, and then received a reduction down to only 4 per cent. Furthermore, no payments were ever made on principal, either during the stated life of the instruments or on their maturity date. In 1948, when, by their terms, they were to be paid, they were simply replaced by a new issue of debentures with a stated interest rate of 4 per cent. Also, as we said in 1432 Broadway Corporation, supra, “It is idle to argue that the debentures were transferable and must therefore be judged separately from the shares.” No such transfer was ever made, and we are not in doubt that it was intended that no transfers would be made so long as National Dairy should own petitioner’s outstanding stock. In Prudence Securities Corporation v. Commissioner, 135 F. 2d 340, where the question was as to the accrual of interest on the bonds of a subsidiary corporation standing in the name of its parent, the United States Court of Appeals for the Second Circuit said: A corporation, ordinarily, cannot in a real sense become a creditor of one of its own incorporated departments. The situation here is substantially the same as if the taxpayer were seeking to deduct accrued interest on its own unissued bonds because it had set them aside in an envelope in its vault. While there are perhaps conceivable circumstances in which accruing interest on bonds of a wholly-owned subsidiary held by its parent company might be deductible from the subsidiary’s gross income, certainly when- the government chooses to assail the transaction such a deduction cannot be permitted. Higgins v. Smith, 308 U. S. 473. While the facts in that case appear to present a more obvious situation than in the instant case, and we are not certain that it was intended, as a matter of law, that where the transaction is assailed by the Government, a subsidiary corporation is in no case entitled to deduct amounts paid as interest on its bonds where the bonds stand in the name of the parent company, we are of the opinion that on the facts here the petitioner, for all practical purposes, was a department of National Dairy, even though incorporated, and that National Dairy did not in a real sense become a creditor of petitioner. See and compare Talbot Mills v. Commissioner, supra; Wetterau Grocer Co., Inc. v. Commissioner, 179 F. 2d 158; Commissioner v. Schmoll Fils Associated, Inc., 110 F. 2d 611; Swoby Corporation, supra; 1432 Broadway Corporation, supra; and Charles L. Huisking & Co., 4 T. C. 595. In our opinion, the ratable annual payments were distributions of corporate earnings under the guise of interest and there was not a forbearance of money or property in the business sense, such as would be required to make the payments deductible as interest under section 23 (b) of the Code. John Kelley Co. v. Commissioner, supra, Commissioner v. Hood & Sons, Inc., supra, Lansing Community Hotel Corporation, supra, Toledo Blade Co., supra, and Cleveland Adolph Mayer Realty Corporation, supra, presented situations which, in our opinion, were factually different.' Of those cases, Toledo Blade Co. is most nearly comparable on the facts. In that case, however, the creation of a debt and of a creditor-debtor relationship between the parent corporation and its subsidiary was obviously intended, whereas in the instant case the presence of such an intent has not been established. Reviewed by the Court. Decisions will be entered wider Bule 50. ARundell, J., dissents on the interest deduction issue. VaN FossaN, J., dissents. Possible exceptions include tbe cream ebeese packaging machine, the Coon process for curing cheese, and probably to some extent, the methods for processing whey. Among the patents first licensed were the reissue of the first processing patent, the blending patent, and the 5-pound loaf boxing patent. It is to be noted, also, that when the Norman Kraft patent, covering the die-cut foil lining packaging device and for which application was pending at May 21, 1930, was issued, it was included in various, if not all, of the licensing agreements, one of which was to Borden which had become or was to become one of Kraft’s stronger competitors. None of the patents covering the “cookers” were included in the license agreements appearing of record but since the licensees processed large amounts of cheese annually they apparently owned or had rights to use other effective devices or apparatus. According to the record, there was no licensing of the cream cheese processing patents nor any effort on the part of Kraft or the petitioner to protect any rights they may have had thereunder, even though in later years, at least, the processing of cream cheese through the use of carob or other gums was rather commonly practiced. So far as appears, the patents covering the Potter or cream cheese packaging machine were never licensed. This machine, we think, was a very great if not the greatest factor in giving Kraft a quite dominant position in the cream cheese field. Another Important factor, however, was the trade name “Philadelphia Cream Cheese.” The petitioner cites Patón, Advanced Accounting (1941), Patón, Accountants’ Handbook (Sd Ed. 1943), and Einney, Principles of Accounting — Intermediate (3d Ed. 1936). Citing Toledo Blade Co., 11 T. C. 1079. Citing T. R. Miller Mill Co., 37. B. T. A. 43. Citing Delaware Corporation Law, sec. 34 (Del. Rev. Code 1935, sec. 2066) ; Lansing Community Hotel Corporation, 14 T. C. 18-3 ; and Toledo Blade Co., supra. Citing, among other cases, United States v. Guinzburg, 278 F. 363; Lansing Community Hotel Corporation, supra; and T. R. Miller Mill Co., supra. Citing Commissioner v. Hood & Sons, Inc., 141 F. 2d 467; Toledo Blade Co., supra; and Lansing Community Hotel Corporation, supra. Citing Toledo Blade Co., supra; Clyde Bacon, Inc., 4 T. C. 1107; and Cleveland Adolph Mayer Realty Corporation, 6 T. C. 730. It is to be noted that while the affirmance of this case, at 160 F. 2d 885, was apparently under the rule in Dobson v. Commissioner, 320 U. S. 489, the court added “that, if the questions were open to us we should reach the same result as did the Tax Court.”