COMMISSIONER OF INTERNAL REVE-
NUE v. TRANSPORT TRADING &
TERMINAL CORPORATION.

No. 175, Docket 20981.

United States Court of Appeals
Second Circuit.

July 11, 1949.

Rehearing Denied Oct. 4, 1949.

Chas. Oliphant, Theron L. Caudle, Washington, D. C., Fred E. Youngman, Washington, D. C., Ellis N. Slack, Helen Goodner, Special Assistants to the Attorney General, Louise Foster, Special Assistant to the Attorney General, for petitioner.

Arthur A. Ballantine, Lawrence F. Casey, New York City, Charles C. MacLean, Jr., New York City, Root, Ballantine, Harlan, Bushby & Palmer, New York City, for respondent.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The Commissioner appeals from an order of the Tax Court, expunging a deficiency assessed against the respondent in its income and declared value excess profits tax for the year 1940. The question is whether the taxpayer realized a capital gain upon the sale of 10,000 shares of stock by the American-Hawaiian Steamship Company, which owned all the taxpayer's shares, which conducted the taxpayer's business by its own officers, and which we shall call the Parent. The facts as found by the Tax Court were in substance as follows. During the year 1940 and for many years before, the Parent had been engaged in intercoastal shipping trade, operating 35 to 40 ships between ports on the Atlantic and Pacific coasts. In 1929 it bought 10,000 shares of the common stock of a corporation, known as the Pacific-Atlantic Steamship Company, for $500,000, which it sold to the taxpayer at a public auction for $20,000 on December 24, 1937. The Parent in its income tax return for that year claimed and was allowed a capital loss of $480,000 upon this transaction. The Pacific-Atlantic Company had been organized in 1929 and was also engaged in shipping between ports on the Pacific and Atlantic coasts. In 1940 it had outstanding two million dollars of bonds, 9,600 shares of preferred stock, whose par value was $50, and about 52,000 shares of no-par value common stock. Of the common shares 20,000 were owned by one Dant and companies controlled by him; 10,000 by the taxpayer; and 6,000 and 4,000 by two others; the remaining 12,000 were scattered. The business of the company had proved unprofitable, and it had never declared a dividend upon either its preferred or common shares; but at the beginning of 1940 it owned thirteen ships of which most of the shareholders, including the taxpayer, wished to get rid. Early in that year, owing to the European war there

was a good market for ships, particularly for those which were old and needed reconditioning, like the company's. Two ships had been sold and five others were under contract or sale, when on March 13 the larger shareholders decided that the remaining six ships and the other assets of the company ought to be disposed of, and sought the consent of the shareholders at large. On April 17 the directors authorized Dant and Fleming, the company's president, to contract for the sale of the other ships; two more were sold, and from the proceeds of all it was possible to retire the bonds and most of the preferred shares. There remained four ships which the British Ministry of Shipping offered to buy at $50 a deadweight ton; and on June 10 Dant called a meeting of some of the larger shareholders to discuss this offer. He attended, as did a number of other shareholders or their representatives, including three directors of the taxpayer. Apparently all except Dant wished to accept the offer; but Dant thought that the good will of the company had a value, and he told the others that, if they would reject the offer, he would guarantee them "against any loss if the ships were not sold either by buying them or working out some other arrangement." All the parties then present reached a basis for the valuation of the common shares of the Pacific-Atlantic Company as follows: the four ships were to valued at $50 a deadweight ton, and were to be treated as though they had been sold at that price, and the apparent profit on that basis taken into account, subject to Federal and State taxes." Also: "all profits which might be earned upon voyages in progress on June 10, 1940, were to be taken into account." The directors of the Pacific-Atlantic Company thereupon on June 26 revoked the authority of Dant and Fleming to sell the ships; and Dant put accountants to work upon the books of the company to compute the book value of its shares as of June 10. The accountants selected September 30 as the right date to close the accounts, because all voyages "in progress on June 10" had then been completed. They found the book value of the shares to be $63.11, based upon a value of $50 a deadweight ton for each of the ships; and they reported to the company on October 28.

Meanwhile on October 21 the taxpayer's directors passed a resolution declaring a dividend of the 10,000 shares of the Pacific-Atlantic Company, and they directed the taxpayer's officers to transfer these to the Parent; which was done on October 25. On October 31 the taxpayer charged its "dividend paid" account and credited its "securities account" with $20,000, and on December 30 it paid a cash dividend of $50,000. On October 31, Morrison, the vice-president of the Parent, and also vice-president of the taxpayer, and the attorney for Dant and his companies, and two others met and discussed Dant's "assurance" to the Pacific-Atlantic stockholders. Dant's attorney tried to get a concession from the others allowing Dant to buy the four ships for $35 a ton, but Morrison refused and the meeting was adjourned to November 11, when Dant and his attorneys once more tried to secure a reduction, which the others again refused. Finally Dant stated that he or one of his companies would offer $60 a share for the stock. A final agreement to that effect was executed on November 22, and on November 25 the Parent delivered to the purchaser a certificate of its 10,000 shares for $600,000, which was later adjusted to $582,285. This sum the Parent reported in its return for 1940 as the sale of property having a cost basis equal to the amount realized. The Commissioner, however, included that sum less $20,000 as part of the taxpayer's income for 1940, on the theory that the taxpayer had sold the shares, whose cost to it was the amount which it had paid the Parent on December 24, 1937.

Even if Dant had not bound himself to buy the Pacific-Atlantic shares, the declaration of them as a dividend in kind with the expectation that the Parent would at once sell them, might alone have been enough to make their proceeds the "amount realized" in the equation of a "long-term capital gain" under § 117(a) (4). That would depend how we read the statute—§ 115(a)—

which defines a dividend as a "distribution made by a corporation to its shareholders whether in money or in other property." If an immediate sale was within sure expectation, that alone might bring the case within such decisions as Gregory v. Helvering[1] and Fairfield S. S. Corp. v. Commissioner.[2] In short we might hold that a "distribution" in such circumstances was not the kind of "distribution" which the statute had in mind; it was not a "dividend" declared in the ordinary course of business. However, the case is far stronger than that; even though we assume with the judge that the taxpayer was not bound to sell the shares to Dant at $50 a ton, plus the profits on voyages "in progress on June 10." We cannot agree with him that Dant was not "committed" to buy the ships; for upon ample consideration he had guaranteed to the Pacific-Atlantic shareholders the equivalent of the British offer; and that in effect gave them—the taxpayer included—an option to sell the shares to him, if they elected to do so. By October 28 Dant's accountants had computed the profits on voyages "in progress at June 10" (which was probably as soon as possible after the closing day, September 30); and three days later the Parent who had received the shares from the taxpayer only on the 25th was insisting that Dant should perform. That at least was an election by the Parent, and it must be remembered that the Parent's will was the taxpayer's, which had no independent will of its own. From all this it appears to us that when the Parent, acting through the taxpayer, had on October 21 declared the dividend to itself, it had already determined to call upon Dant to carry out his engagement, and that a declaration of the dividend was only a step in the means by which it intended to carry out the sale. Although the judge made no such finding, none was necessary for we think the evidence so plain that we should have held a finding to the contrary "clearly erroneous." The legal situation on October 21 was therefore that the Parent had determined to demand performance, and that that determination needed no more at most than a declaration by the Parent's puppet, the taxpayer, that it chose to assert its option.

█ The matter having come to such a posture, we hold that the "long-term capital gain"—§ 117(a) (4)—was realized by the taxpayer on November 25, because under the decisions we have already cited, the declaration of the dividend on October 21 was not that kind of "distribution" which § 115(a) presupposes. It was not a distribution for the purposes of the Parent's business, but only in order to escape a tax and such a "distribution" is not among those contemplated in the section. Nor is this conclusion shaken though we assume, as we already have, that the taxpayer until October 21, and the Parent thereafter, would have been free to withdraw and refuse to sell. Since the proceeds of the sale were in any event to reach the same treasury, it was altogether irrelevant that the title to the shares passed from the Parent and not from the taxpayer. The doctrine of Gregory v. Helvering, supra,[1] which we here hold to be controlling, is not limited to cases of corporate reorganizations. It has a much wider scope; it means that in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation. Finally, it is plain that the excuse is not valid that the taxpayer declared the dividend in order to avoid the "undistributed profits tax" imposed by § 102 of the Revenue Act, 26 U.S.C.A. § 102. Had it made the sale in its own name, it could have escaped that tax quite as safely by declaring the proceeds as a dividend as it did by declaring the shares themselves.

Order reversed; deficiency reassessed.

---

[1] 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

[2] 2 Cir., 157 F.2d 321.