**Harry H. HINES, Jr., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. EC 70-96.**

United States District Court, N. D. Mississippi, E. D.

June 8, 1972.

James P. Knight, Jr., Jackson, Miss., for plaintiff.

H. M. Ray, U. S. Atty., N. D. Mississippi, Oxford, Miss., Jack D. Warren, Atty., Refund Trial Section # 2 U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action was tried to the court without a jury at the United States Courthouse in Aberdeen, Mississippi, on November 18, 1971. At the conclusion of the trial the court requested the parties to submit proposed findings of fact and conclusions of law; also briefs in support of their respective positions.

The court has considered the evidence introduced at the trial, the record in the

action, the proposed findings of fact and conclusions of law and the memorandums of authorities submitted by the parties. The action is now ripe for decision.

The findings of fact and conclusions of law required by Rule 52(a) F.R.Civ. P. are incorporated in the Memorandum of Decision which follows.

The issues which have been submitted to the court for decision grow out of the distribution and transfer to its stockholders of certain real property[1] by Peeler Realty Company, Inc. (corporation), a Mississippi corporation having its principal place of business at Kosciusko in Attala County, Mississippi. The timberland was conveyed by the corporation to its stockholders as tenants in common, with each stockholder receiving an undivided interest therein, the quantum of each interest being equal to the stock interest of each stockholder in the corporation.

For many years prior to 1950 S. J. Peeler (Peeler) was a successful businessman, operating a large lumber business at Kosciusko, Mississippi. In the course of his business Peeler acquired a large amount of cut-over land situated in Attala and adjacent counties in the State of Mississippi.

Peeler organized the corporation in 1950. The authorized capital stock consisted of 4,000 shares of no-par common stock. The incorporators were Peeler, his wife, Ethel Peeler, and plaintiff, Harry H. Hines, Jr., Peeler's grandson. At the first meeting of the incorporators and subscribers to the capital stock of the corporation on November 6, 1950, Peeler offered to transfer the timberland involved in this action and certain rent houses owned by him, and situated in Kosciusko, in exchange for 3,998 shares of the corporation's capital stock. This offer was accepted. The two shares remaining were retained as qualifying shares. The timberland conveyed to the corporation by Peeler, the transfer of which is the subject of this action, consisted of approximately 27,500 acres.

Immediately after the corporation was formed, Peeler began to transfer the stock held by him, by way of gifts, to his wife, children and grandchildren. By November 19, 1954 Peeler had transferred all of his stock in the corporation to members of his family, except 160 shares. By August 25, 1965, Peeler had divested himself of his stock interest in the corporation. Peeler had three children, and on the last mentioned date the stock in the corporation was held as follows: Mrs. Peeler, the wife, held 1,000 shares; Mrs. Lacy, a daughter, held 750 shares, and her son, the plaintiff, held 250 shares; Mrs. Seay, a daughter and her three children, held 1,000 shares, and the widow and children of H. Elmo Peeler, a son, held the remaining 1,000 shares.

The timberland conveyed to the corporation did not produce any significant income during the period 1950 to 1966. Occasionally the corporation would sell a small tract of land, or an easement over the land to some utility. Small quantities of timber were marketed during this period but on the whole the greater portion of the income of the corporation was represented by rents collected from the low-cost rental houses conveyed to the corporation. During the twelve year period from 1954 to 1965 there were only four years in which the corporation showed a profit from its operations. In 1955 the corporation made $565.71, in 1957, $284.68, in 1958, $270.16 and in 1963, $1,062.56. In the year 1966 the corporation lost $619.38, and in 1967, $383.24. The corporation's surplus account on October 31, 1966, the end of the fiscal year, showed a deficit balance of $45,950.97. This deficit increased to $46,334.21 on October 31, 1967.

1. The real property consisted, for the most part, of unimproved timberland, acquired many years prior to 1950 by S. J. Peeler, the founder of the corporation.

The property will be referred to in this memorandum at times as "land" and at other times as "timberland".

The losses of the corporation were attributable primarily to the fact that the income on the rental property of the corporation was not sufficient to pay the annual operating expenses, and ad valorem taxes on the idle timberland. Ad valorem taxes on the real property owned by the corporation increased each year. In 1961 these taxes were approximately $8,000.00. By 1965 the taxes had increased to approximately $14,000.00.

Robert W. Hartford (Hartford), a certified public accountant and an attorney, became acquainted with Peeler in 1930. From 1948 until Peeler died in 1967 Hartford was Peeler's attorney and tax consultant. During the latter years of his life Mr. Peeler became incompetent to manage his affairs. On July 11, 1957 Peeler executed a will in which he devised all real property owned by him at his death, except his home, to the corporation. Hartford was named as the executor of the will to serve without bond.

The directors of the corporation, on August 27, 1965, were S. J. Peeler, Mrs. Ethel P. Peeler, Mrs. Josephine A. Peeler, Mrs. Louise P. Seay and Harry Hines, Jr. The officers of the corporation on this date were S. J. Peeler, President, Mrs. Ethel P. Peeler, Vice-President, Harry Hines, Jr., Secretary, Mrs. Ethel P. Peeler, Treasurer.

In 1964 Georgia-Pacific Company (Georgia-Pacific) opened negotiations with the corporation to purchase the timberland of the corporation. Georgia-Pacific had acquired large timber and lumber operations in an adjacent county and was interested in purchasing other timberland to support this operation. A written proposal was made by Georgia-Pacific on November 20, 1964 to purchase the timberland at a cash price of $57.00 per acre.

Georgia-Pacific's proposal contained an alternate offer to purchase the land at $50.00 per acre, and pay for it with Georgia-Pacific's common stock, thus effecting a tax-free exchange. When the proposal was not accepted Georgia-Pacific increased the offer orally to $63.00 per acre, which offer was also declined. The offers were made after Georgia-Pacific cruised the timberland. Georgia-Pacific's written offer indicated that plaintiff was aware of the tax consequences of the sale, and was giving consideration to the manner in which the sale might be consummated should the corporation decide to sell the land.

Plaintiff testified he thought the price offered by Georgia-Pacific was not enough. Two of the stockholders did not want to sell. One of the stockholders was plaintiff's mother. She did not want to sell the land during the lifetime of her father. The other stockholder was a college student who held 6% of the stock.

There were large paper mills and other lumber dealers who were interested in acquiring the corporation's timberland. In the latter part of 1965 plaintiff discussed a possible sale with International Paper Company (International), Weyerhaeuser Company (Weyerhaeuser), St. Regis Paper Company (St. Regis) and Attala Lumber Company (Attala). International and St. Regis made cruises of the timber after the corporation indicated it was interested in selling the land.

The majority of the stockholders in the corporation were in need of funds and were anxious to secure money from the corporation. The only source from which the money could be obtained was through a sale of the timberland, or portions thereof, or, through the sale of growing timber.

Hartford was elected chairman of the board at a stockholder's meeting on August 27, 1965, and in a combined meeting of stockholders and directors on December 27, 1965 Hartford discussed at length the corporation's financial condition. Hartford testified:

"I pointed out and gave the pros and cons of these matters. I said, 'we can continue as we are, and we really could not continue as we were going as we were losing money, and we would actually wind up in bankruptcy.

If we could liquidate the corporation we could do that under a one-month liquidation and I gave the pros and cons of that type, or we could liquidate under a twelve-month liquidation, and I gave the pros and cons of that. Or we could separate the land which was causing the problem from the rest of the property, and I gave the pros and cons of that.'

So, that, generally, sir, is what I was trying to get across to the members of the board that they had to do something because they could not continue at the present rate and in the present direction."

On January 18, 1966 the directors held a special meeting at which they decided to recommend to the stockholders that the corporation's timberland be distributed to the shareholders, each stockholder to receive the same interest in the land as the stockholder held in the corporation. The stockholders met in a special meeting immediately following the directors' meeting and approved the recommendation of the board. Accordingly, the stockholders authorized the withdrawal of the land from the assets of the corporation, and the transfer or conveyance of the legal title to the stockholders.

Plaintiff was the spokesman for practically all of the stockholders. He was aware of the tax consequences incident to the sale of the land by the corporation. The tax basis of the land was extremely low, not more than $40,000.00. It was apparent to everyone that the land would bring in excess of $1,500,-000.00. A sale by the corporation would result in double taxation. After payment of the corporate tax, any distribution to stockholders would be taxed as a dividend. Plaintiff and Hartford desired to avoid the double tax. The financial condition of the corporation required that some action be taken. To ignore the issue would eventually lead to insolvency.

The corporation could not cease doing business and dissolve if it was to receive the real property devised to it by Pee-ler's will, for Peeler lacked the testamentary capacity to change the will. The demands of the stockholders for money could not be satisfied without disposing of the land, or some part thereof.

As soon as the decision was reached to distribute the land, the law-firm of Love & Love (attorneys) was engaged to prepare the conveyance. The land was located in several Mississippi counties. Before preparing the deed it was necessary for the attorneys to search the land records in each county to secure adequate descriptions of the several tracts of land to be conveyed. The attorneys were contacted and authorized to begin the work immediately after the January 18, 1966 meeting of the stockholders. It was not until March 30, 1966, however, that the deed could be executed by corporate officers. Once the deed was executed and recorded, the attorneys were authorized to make a title search of each tract and perform any work determined to be necessary in order to cure defects in the title.

This work was not completed until October 1966. In the meantime, the stockholders executed a power of attorney to Mrs. Ethel Peeler, the plaintiff, Harry H. Hines, Jr. and Hartford, in which they authorized and empowered their said attorneys-in-fact to handle the land and, among other things, to sell it, if in their judgment they decided that a sale should be made. The power invested in the attorneys-in-fact by the document was extensive and broad, granting them almost unlimited power over the disposition of the property.

As soon as the attorneys had completed their work and the attorneys-in-fact had assurances that the title to the land would be insured by the title company, the attorneys-in-fact sent "Sales Guidelines" to International, Georgia-Pacific, St. Regis and Attala, inviting them to submit sealed bids for the purchase of the land. The attorneys who performed the title work and Hartford authored the "Sales Guidelines". This document contained the conditions and terms of the sale and the method and manner of

bidding on the land. The bids were scheduled to be and were opened in the office of Peeler Realty Company on November 14, 1966. International and Georgia-Pacific submitted bids. The bid of International was $2,533,580.50. The bid by Georgia-Pacific was $2,175,000.00. The land to be sold comprised 25,182 acres. International's bid was accepted and the land was sold and conveyed to it on December 15, 1966, at which time International paid the purchase price to the attorneys-in-fact.

Prior to the sale of the land to International, the attorneys-in-fact sold a small tract of the land to Willie C. Welch for the sum of $8,000.00. The money received from both purchasers, amounting to $2,541,580.50, less the expenses of sale, was distributed to the stockholders. The expenses amounted to $99,831.27. Hartford was paid $25,415.80 for services rendered in planning the sale, and other related work. Love & Love were paid a like amount for the title work, including services in regard to the sale. Plaintiff was paid a similar amount for his services in the matter. The balance of $2,441,749.23 was distributed to the stockholders as follows: $2,406,000.00 on December 15, 1966 and $35,749.23 on April 10, 1967.

The corporation did not report the above mentioned sales on its corporate income tax returns. Each stockholder, including plaintiff, reported his pro rata portion of the sales on his individual returns, claiming long term capital gain treatment on each sale.

Upon examination of the income tax returns of the corporation and its stockholders, the Commissioner taxed the gain on the sales to the corporation and then taxed each stockholder with receipt of a dividend resulting from his receipt of a pro rata part of the proceeds. Without inclusion of the gain from the sales in its returns, the corporation had no accumulated earnings and profits for the years examined from which a dividend could be paid.

The plaintiff instituted this action for the recovery of $7,900.24 in federal income taxes alleged to have been erroneously and illegally assessed and collected for the calendar years 1966 and 1967. In the pre-trial order plaintiff contends that he brought the action sub judice to obtain an adjudication on his behalf and on behalf of the corporation and other stockholders of the tax effect of the transaction. The tax assessment against the corporation is pending in the Tax Court.

The controlling question in the action is whether the profit realized on the sale of the timberland distributed as a dividend-in-kind to the stockholders may be imputed to the corporation as capital gain and to plaintiff as dividend income to the extent of his interest therein.

The Commissioner concluded that the gain on the sales of the land by the stockholders was imputed to the corporation on the grounds that the distribution lacked a normal and justifiable commercial motivation and was made for the principal purpose of avoiding tax. By imputing the sales to the corporation the Commissioner determined that the corporation then had current earnings and profits out of which to pay a dividend, and that the distribution to the stockholders constituted a regular dividend to the extent of the current earnings and profits and the balance constituted a return of capital to the extent of their basis in the stock and any excess would be accorded capital gain treatment. The Commissioner based his conclusion on United States v. Lynch, 192 F.2d 718 (9th Cir. 1951); Commissioner of Internal Revenue v. Transport Trading and Terminal Corporation, 176 F.2d 570 (2nd Cir. 1949), and Commissioner of Internal Revenue v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

Plaintiff relies principally upon United States v. Cumberland Public Service Company (1950) 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 to sustain his claim for refund.

In *Cumberland* the taxpayer (Cumberland) was engaged in the business of generating and selling electric power in

three Kentucky counties. A local cooperative began to distribute Tennessee Valley Authority power (T.V.A.) in the area served by Cumberland. Cumberland could not obtain power from T.V.A. and it soon became apparent that Cumberland could not compete with T.V.A. power distributed by the cooperative. The shareholders of Cumberland offered to sell all of the corporate stock to the cooperative. The cooperative refused to buy the stock but countered with an offer to buy from Cumberland its transmission and distribution equipment. Cumberland rejected the offer because it would have been compelled to pay a heavy capital gains tax. At the same time, the stockholders, desiring to save payment of the corporate tax, offered to acquire the transmission and distribution equipment and then sell to the cooperative. The cooperative accepted. Cumberland transferred the transmission and distribution system to its shareholders in partial liquidation. The remaining assets were sold and Cumberland dissolved. The shareholders then executed the previously contemplated sale to the cooperative. Upon this sale by the shareholders the Commissioner assessed and collected a $17,000.00 tax from Cumberland on the theory that the shareholders had been used as a mere conduit for effectuating what was really a corporate sale. Cumberland instituted an action in the Court of Claims to recover the amount of the tax. The Court of Claims found that the method by which the shareholders disposed of the properties was chosen in order to reduce taxes, but that the liquidation and dissolution genuinely ended Cumberland's activities and existence. The Court of Claims also found that at no time did Cumberland plan to make the sale itself. Accordingly, the Court of Claims found as a fact that the sale was made by the shareholders rather than Cumberland and entered judgment for Cumberland. One judge dissented, believing the holding of the Supreme Court in Commissioner of Internal Revenue v. Court Holding Co., *supra,* required a finding that the sale was made by Cumberland. The Supreme Court granted Certiorari to clear up doubts arising out of the *Court Holding Company* case.

The Supreme Court held that the *Court Holding Company* case was not controlling and could be distinguished from Cumberland. In *Court Holding Company* the corporation negotiated a sale of its assets, accepting a down payment on the sale. When the tax consequences of the sale were belatedly recognized, the corporation transferred its assets to its stockholders, who promptly conveyed the properties to the same person who had negotiated with the corporation. The Tax Court found that the corporation never really abandoned its sales negotiations, that it never did dissolve and that the sole purpose of the so-called liquidation was to disguise a corporate sale through the use of mere formalism in order to avoid tax liability.

The feature which distinguishes Cumberland from *Court Holding Company* is that Cumberland liquidated and dissolved, transferring its transmission and distributing system to its shareholders, selling its other assets and quitting business, while in *Court Holding Company* the corporation did not dissolve. The court said in *Cumberland,* in discussing the language used by the court in *Court Holding Company,* that:

> "This language does not mean that a corporation can be taxed even when the sale has been made by its stockholders *following a genuine liquidation and dissolution.* While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. *The corporate tax is thus aimed primarily at the profits of a going concern.* This is true despite the fact that gains realized from corporate sales are taxed, perhaps to prevent tax evasions, even where the cash proceeds are at once distributed in liquidation.

But Congress has imposed no tax on *liquidating distributions in kind or on dissolution,* whatever may be the motive for such liquidation. Consequently, a corporation *may liquidate or dissolve* without subjecting itself to the corporate gains tax, even though a primary motive is *to avoid the burden of corporate taxation.*" (Emphasis supplied) 338 U.S. at 454, 455, 70 S. Ct. at 282.

In the action sub judice the corporate taxpayer did not dissolve, or cease doing business. The fact is the stockholders deliberately continued the corporation as a going concern. During its fiscal years ending October 31, 1968 and October 31, 1969, the corporation received gross rents of $29,054.87 and $32,703.47 and had net profits of $1,611.93 and $2,497.-37. In *Cumberland* the corporation transferred its transmission and distribution system to its stockholders, liquidated its other assets, dissolved and ceased to do business. It is, therefore, apparent that in *Cumberland* there was a "genuine liquidation and dissolution", while in the case sub judice there was no dissolution or liquidation. The stockholders deliberately elected to continue the corporation as a going concern so that the corporation might receive the real property under Peeler's will. Peeler died December 9, 1967 and left holdings valued at $90,790.00 to the corporation.

The defendant cites, as supporting its view, *Court Holding Company, Lynch* and *Transport Trading and Terminal Corporation* cases, *supra.* There are, however, distinguishing features in each case.

In *Court Holding Company* the stockholders completed a sale negotiated by the corporation immediately before the corporation transferred the properties to the stockholders. In the action sub judice the corporation had not negotiated the sale of its timberland to anyone prior to transferring it to the stockholders. After the transfer the stockholders were not obligated to sell the land to any particular purchaser, and arranged their own sale.

In United States v. Lynch, the Washington Fruit and Produce Company, a corporation, distributed an inventory of apples to its stockholders as a dividend-in-kind. The stockholders arranged for the corporation to sell the apples and account to them for the proceeds, deducting the cost of washing, packing and storing. The dividend in kind was declared February 28, 1944. The apples were sold in April 1944. The corporation was liquidated April 29, 1944. The Commissioner determined that the excess of the sale price of the apples above cost to the corporation was corporate income. The trial court found otherwise, but the Court of Appeals upheld the determination of the Commissioner, and in doing so said:

"The Commissioner held that the excess of the sale price of the apples above cost to the corporation was corporate income. The trial court found otherwise. We think its finding was clearly erroneous for the following reasons: The dividend *was not, nor was it intended to be, a liquidating dividend made in the process of winding up corporate affairs.* The trial court found the dividend to be an ordinary one, reported as ordinary income by the recipients. *The corporation continued to engage in its normal business for a period of two months after the dividend declaration.* We are, therefore, required to regard the dividend under consideration here as one declared by a going concern and, inasmuch as the corporation, among other things, was engaged in the business of selling apples the property distributed represented its inventory or stock in trade." (Emphasis supplied), 192 F. 2d at 720.

*Lynch* differs in several respects with the action sub judice, though some of the points of the decision may be persuasive on the issues here presented. In *Lynch* the assets transferred represented the stock-in-trade or inventory of the corporation. Here, the asset transferred

consisted of real property. In *Lynch* the inventory was retained by the corporation and marketed. The corporation marketed it and accounted to the stockholders for the proceeds of the sale. Here, the corporation did not have any connection with the timberland after its transfer to the stockholders. One other feature is noted. In *Lynch*, the corporation continued its normal business operation for two months, while here the corporation still operates as a going concern.

Commissioner of Internal Revenue v. Transport Trading and Terminal Corporation, *supra*, involved a dividend-in-kind authorized by a corporation in which the only shareholder was another corporation which owned all of the former's stock. The dividend consisted of stock in a third corporation. At the time of the transfer one Dant had committed himself to purchase for a fixed price the stock distributed by the dividend to the parent corporation. The taxpayer's basis for the stock was $20,000.00 The parent company sold the stock for $700,000.00. The Commissioner determined that the sale was in fact the sale of the taxpayer, resulting in a capital gain upon which taxes were due. The feature in the *Transport Trading & Terminal Company* case which distinguishes it from the action sub judice, is, that, as in *Court Holding Company*, the stockholder merely completed a deal previously arranged by the distributing corporation. Here, there was no predistribution agreement of sale.

The facts in this action show that Hartford suggested, as a matter of tax planning, that the timberland be distributed to its stockholders. In mid-December 1965 Hartford and plaintiff visited the law offices of Love & Love, and advised John C. Love, Jr., a member of the firm, that they wanted to transfer the land out of the corporation to the stockholders. Thereafter, on January 18, 1966 the stockholders and the Board of Directors authorized the transfer to be made, and the attorneys started the search of land records preparatory to the preparation of the conveyances. As soon as the conveyances were made on March 30, 1966, the attorneys began the title curative work, and this was not completed until October. Then, in October the "Guidelines" were sent to prospective purchasers and in December the sale was completed. It is apparent that the market was right for the land sale and that an excellent price for the land could be obtained. The sale of the land provided a means of reducing the drain on the funds of the corporation, or of its stockholders, to meet the tax bill, as well as furnishing funds with which to meet the demands for cash of the stockholders.

The land, as Hartford said, was "separated" from the corporation. The effect of the transaction was to withdraw an appreciated asset from the corporation and place the same at the disposal of the stockholders. The court finds that the primary reason for the distribution of the land was to avoid the corporate tax. It is true, as plaintiff asserts, that there were valid business reasons for selling the land. The corporation could not afford to keep the land as an asset because of the lack of funds with which to pay taxes. The demands of the stockholders for funds could not be met without a sale of the land. It was apparent that a good market existed and that good business principles dictated a sale. The stockholders, for reasons satisfactory to them, elected to continue the corporation as a going concern. The sale could not be made by the corporation without payment of the corporate tax. So, at the suggestion of Hartford, the stockholders decided to separate or withdraw the land from the corporation, evidently with the view that such withdrawal would constitute a partial liquidation. There is, however, no basis in the record for a holding that the distribution of the land constituted a partial liquidation within the meaning of either Section 336 or 346 of the Internal Revenue Code. (26 U.S. C.A. § 336, 346).

The court having found that the primary or principal purpose for the distri-

bution of the land was to avoid the double tax, it is concluded that the proceeds of the sale should be attributed to the corporation as capital gain and to plaintiff as dividend income to the extent of his interest therein.

Although the factual situation in the action sub judice differs in some respects to the facts involved in Commissioner of Internal Revenue v. Court Holding Co., *supra*; Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., *supra*; and United States v. Lynch, *supra*, the court feels that the substantive rules of law enunciated in these cases control the disposition of this action.

Judgment will be entered for defendant.