PEELER REALTY COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2328–71. Filed August 14, 1973.

*James P. Knight, Jr.*, for the petitioner.
*Robert D. Hoffman*, for the respondent.

FORRESTER, *Judge:* Respondent determined a deficiency of $601,-872.53 in petitioner's income tax for the taxable year ended October 31, 1967. The sole issue presented for our decision is whether petitioner is liable for the corporate income tax on sales by its shareholders of appreciated land which had been conveyed to such shareholders by petitioner as a dividend-in-kind. The two theories under which petitioner might be held liable for such tax—the imputed income and the anticipatory assignment of income doctrines—will be considered separately.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. Petitioner Peeler Realty Co. is a Mississippi corporation which had its principal place of business in Kosciusko, Miss., at the time it filed the petition herein. It filed its Federal income tax return for the taxable year ended October 31, 1967, with the director, Internal Revenue Service Center, Chamblee, Ga.

At the time of petitioner's incorporation in 1950, S. J. Peeler (S.J.), who had been in the lumber business since the 1930's, transferred about 27,000 acres of mostly cutover timberland (hereinafter referred to as the lands) and approximately 100 low-cost rental housing units to petitioner in exchange for all its 4,000 shares of capital stock. The greater part of such lands had been acquired by S.J. at tax sales in the late 1930's at costs of 50 and 75 cents an acre. At some time, believed to be in the early 1950's, S.J. transferred by gift all 4,000 shares of petitioner's stock to his wife, three of their children, and grandchildren born to these three. As of November 1, 1965, stockholdings were as follows:

| | | Shares | Percent of shares outstanding |
|---|---|---|---|
| (1) | Mrs. Ethel Peeler (director and vice president) | 1,000 | 25.00 |
| (2) | Mrs. Beatrice Peeler Hines Lacey | 750 | 18.75 |
| | Harry H. Hines, Jr. (director and secretary-treasurer) | 250 | 6.25 |
| | | 1,000 | 25.00 |
| (3) | Mrs. Louise Peeler Seay (director) | 320 | 8.00 |
| | Clant M. Seay, Jr | 240 | 6.00 |
| | Samuel P. Seay [1] | 240 | 6.00 |
| | Ethel Louise Seay [1] | 200 | 5.00 |
| | | 1,000 | 25.00 |
| (4) | Mrs. H. Elmo (Josephine) Peeler, Sr. (director) | 70 | 1.75 |
| | H. Elmo Peeler, Jr.[2] | 240 | 6.00 |
| | Lady Rachel Peeler Parker | 240 | 6.00 |
| | Mrs. Zona Peeler Jones | 240 | 6.00 |
| | Deposit Guaranty Bank & Trust, Trustee u/w H. Elmo Peeler, Sr. (deceased) | 210 | 5.25 |
| | | 1,000 | 25.00 |
| | Total issued and outstanding | 4,000 | 100.00 |

[1] Minors—as of Nov.1, 1965, Mrs. Louise P. Seay is guardian.
[2] Minor as of Nov. 1, 1965, Mrs. Josephine Peeler is guardian.

(1) Mrs. Ethel Peeler is the widow of Mr. S. J. Peeler, the individual who created the corporation.

(2) Mrs. Beatrice P. Lacey is the daughter of S. J. Peeler. Harry H. Hines, Jr., is Mrs. Lacey's son.

(3) Mrs. Louise P. Seay is the daughter of S. J. Peeler. Clant M. Seay, Jr., and Samuel P. Seay and Ethel Louise Seay are Mrs. Seay's sons and daughter.

(4) Mrs. H. Elmo Peeler, Sr., is the daughter-in-law of S. J. Peeler. H. Elmo Peeler, Sr., died and his wife inherited her present ownership of 70 shares.

The business operations of petitioner from the date of its formation consisted almost exclusively of holding the lands conveyed to it by S.J. and renting its approximately 100 houses. From its inception, its record of earnings—as found in its corporate income tax returns—has not been an auspicious one:

| | | | | |
|---|---|---|---|---|
| 1950 | ($911.39) | | 1958 | ($2,146.77) |
| 1951 | None | | 1959 | (7,420.80) |
| 1952 | 14,582.53 | | 1960 | (2,359.39) |
| 1953 | (260.70) | | 1961 | (5,091.39) |
| 1954 | 565.71 | | 1962 | 1,062.56 |
| 1955 | (283.08) | | 1963 | (3,476.89) |
| 1956 | 284.68 | | 1964 | (555.73) |
| 1957 | 270.16 | | | |

Except for the taxable year 1952, in which approximately 1,200 acres of the lands were sold to the Mississippi Products Co. for about $15,000, the above-mentioned rentals have been the major item of income reported by petitioner in its corporate income tax return. Other items of income have included gains from occasional sales of rights-of-way, lumber, stumpage, payments on clay, and oil and gas leases. Its principal expense over the years has been the annual ad valorem taxes it has had to pay on the lands. Such taxes increased yearly from $7,331.26 in 1950, to $14,636.49 in the 1964 taxable year.

In early 1951, a severe ice storm had occurred in the area of the lands, and this was followed by severe droughts in 1952 and 1953. The dry condition resulted in some fires which caused damage to the timber on the lands. The lands were not actively farmed for timber but some trees were planted between 1955 and 1960.

In 1964 and 1965, negotiations were carried on between petitioner and Georgia-Pacific Corp. (hereinafter referred to as G–P) relating to a sale of the lands. On September 30, 1964, the consulting firm of Pomeroy & McGowin submitted a report to G–P of a timber cruise [1] it had made of the lands. As a result of this cruise, William C. Norman, vice president, Crossett Division of G–P, made the following offer to petitioner by letter dated November 20, 1964:

Subject to the approval of our Board of Directors which will be more or less routine, I have the authority from our President to advise your company as follows:

1. Based upon your discussions with Mr. Sihvonen after permitting you to exclude certain pasture land, we will pay you $57 per acre for your timber lands in cash.

2. As an alternative, for the same lands on the basis of a tax free exchange we will pay the purchase price in the form of Georgia-Pacific common stock in an amount equivalent to $50 per acre based upon the market value of the stock at the time of the exchange.

Plus, a promise to issue up to an additional amount of Georgia-Pacific common stock equivalent to $7 per acre if the initial shares of the G–P common plus stock dividends and splits, if any, valued at closing New York Stock Exchange price does not equal or exceed an amount equal to $57 per acre within 3 years from the date of closing.

This offer, together with a later offer by G–P of between $60 and $63 per acre, was rejected by petitioner. In the latter part of 1965, the possibility of sale was also discussed with the Weyerhaeuser Co., International Paper Co. (hereinafter referred to as IP), St. Regis Paper Co., and the Attala Lumber Co. The companies took timber cruises of the lands. None of these latter discussions, however, resulted in any offers concerning the lands. Petitioner at no time entered into

[1] A timber cruise appears to be a survey to determine the type, amount, and condition of trees in a particular area.

any agreements, oral or written, to sell the lands, nor did it grant any options covering any of the lands.

On January 18, 1966, petitioner was authorized by vote of its shareholders to distribute to such shareholders approximately 25,000 acres of the lands. The distribution was effected by warranty deed on March 30, 1966, each shareholder receiving an undivided interest in the conveyed lands.[2] The deed was prepared by John C. Love (Love), an attorney in Kosciusko, who began work on determining the proper description of the lands conveyed at about the time of the shareholder resolution on January 18.

Love and his father, who were copartners, had been contacted in December of 1965 by Harry Hines (Hines) and Robert Hartford (Hartford), two of petitioner's directors, and had at that time agreed to assist in the legal work which would be required if it was decided to take the lands out of petitioner. About a month after the conveyance of March 30, Love was further instructed by Hines to begin checking the titles of the conveyed lands. Pursuant to such instruction, Love made an examination of the titles, and where he found inconsistencies and discrepancies, initiated title confirmation suits. This title examination and correction work was completed by Love some time in early October 1966.

On various dates from June 7, 1966, to August 5, 1966, a very broad power of attorney was executed by all stockholders of petitioner in favor of Ethel Peeler, Hines, and Hartford. Among other powers, the three appointees, known as the "Peeler Agency" (hereinafter referred to as the agency), were authorized to "operate, manage and control" said lands and/or "to sell, negotiate for sale of, to grant options on" said lands, any such actions to be by unanimous consent of the three. The selection of Hines, who was S. J.'s grandson, and Hartford, men thoroughly acquainted with the operations and problems of the petitioner, was not at all surprising. Hines, a graduate of the University of Mississippi law and business schools in the 1940's, had worked in his grandfather's lumber business since 1949. During the 1964–65 period, it was he who represented petitioner in most of the sales discus-

---

[2] A liquidation distribution of the lands to the shareholders was never seriously considered because petitioner did not wish to lose a bequest to it under the will of S. J., who died on Dec. 9, 1967, at the age of 87. S. J.'s will, executed on July 11, 1957 appointed Robert Hartford, one of petitioner's directors, as executor, and bequeathed to petitioner all of S. J.'s lands and real estate, except for his home. Attempts were not made to have S. J. change the will as it was the opinion of at least Hartford that S. J. had become mentally incompetent by the time of the 1964–66 period. S. J.'s inability to take care of himself during the last years of his life and his difficulty in recognizing others, was attested to by Ethel Peeler, his wife, and Beatrice Peeler Lacey, his daughter, both of whom were living with him during those years. At the time of his death, S. J. owned real estate, exclusive of his home, valued at approximately $90,000.

The petitioner retained an interest in one-half the minerals in the property conveyed. There were approximately 8,688 mineral acres.

sions then being carried on with the various lumber companies mentioned above. Hartford, also a lawyer, had been a C.P.A. since 1933, and his firm had represented S. J. and his family interests since 1930. He began personally to represent the Peelers in 1948, and assisted in the incorporation of petitioner in 1950. Since 1950 he has each year prepared petitioner's corporate income tax return, and has also prepared the individual returns of several members of the Peeler family. In 1964 or 1965, he was elected a director of petitioner, and was involved in the 1965 discussions with IP as to the sale of the lands. Together with Ethel Peeler, Hines and Hartford were considered by the other shareholders, none of whom displayed much understanding of the corporate or tax aspects of the transactions which occurred in 1965 and 1966, as being the best qualified to make decisions concerning the holding or sale of the lands.

Sometime after the execution of the above-mentioned power of attorney, Hines went to see Richard Allen (Allen), head forester of the Dewease Lumber Co. in Philadelphia, Miss. Hines inquired of Allen as to whether the lands might be incorporated into the Dewease Tree Farm family. Allen suggested that the agency first determine the value of the lands, and that once having made such determination, they could then better ascertain the most advantageous use of the lands. Allen had been approached in the mid-50's by S. J. as to whether the same lands could be utilized for tree farming, but nothing had resulted from that contact. Allen was in Indonesia at the time of the trial of this case and hence unavailable for testimony.[3]

On October 8, 1966, the agency sent invitations to bid on the lands to the Attala Lumber Co., G–P, IP, and St. Regis Paper Co. These invitations, known as the "Sale Guidelines" (hereinafter referred to as the guidelines), provided for bids, accompanied by payment of $50,000 with each bid, to be opened on November 14, 1966, at the office of petitioner. The agency reserved the right to reject any and all of the bids received. By November 14, 1966, two bids had been received, these being from G–P for $2,175,000 (approximately $86 per acre), payable in three installments through March 1968, and from IP for $2,533,580.50 (approximately $101 per acre), payable in full in December 1966. The latter bid was accepted on November 14, and the lands conveyed to IP by warranty deeds on December 15, 1966.

The only other sale executed by the agency was one to Willie C. Welch on October 13, 1966. Welch, who had previously overseen some timberland for the Peelers, paid $8,000 for the tract, which included cropland.

---

[3] Allen was also out of the country at the time of the District Court trial dealing with Hines' liability for individual income tax arising out of these same transactions. The record of that trial was attached as an exhibit to this case.

Petitioner did not report these sales on its corporate income tax returns. Each stockholder reported his pro rata portion of the sales proceeds on his individual return, and claimed long-term capital gain treatment. Upon examination of the above returns, respondent treated the gain on the sales as taxable to petitioner, and each of the shareholders was treated as having received a dividend in the amount of his pro rata share of the proceeds of the two sales. Because petitioner had neither current nor accumulated earnings and profits a taxable dividend could not be deemed to have been paid to the shareholders unless the gain from the sales of the lands is imputed to petitioner.

OPINION

The issue for our decision is whether the gain from the sales of lands conveyed by petitioner to the shareholders as a dividend on March 30, 1966, should be imputed to petitioner. It is respondent's theory that such an imputation is required because the distribution was made in contemplation of a sale by the shareholders and was carried out for no legitimate business purpose, but rather for the sole purpose of avoiding tax on a sale at the corporate level.[4] Petitioner not only denies respondent's allegations as to the contemplation of a sale by the shareholders, and as to the lack of a business purpose, but also argues that his theory does not support an imputation to petitioner. Rather, petitioner contends, to support an imputation, it must necessarily be found either (A) that the corporation participated actively in the sales transaction, or (B) that there was an anticipatory assignment of income.

Under our decision in *Jack E. Golsen*, 54 T.C. 742, 756–757 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), our choice of whose theory of imputation to accept is controlled by a definitive statement on the issue by the Fifth Circuit, as it is to that circuit that an appeal of this case lies. The Fifth Circuit made such a definitive statement in *Hines* v. *United States*, 477 F. 2d 1063 (C.A. 5, 1973), reversing 344 F. Supp. 1259 (N.D. Miss. 1972), in which it rejected respondent's theory of liability. In that case, the threshold issue before the court was identical in every detail to the issue before us now. Hines, a director and secretary-treasurer of petitioner, decided to pay the deficiency assessed on his individual return in connection with the sales to IP and Willie Welch. After making such payment, he filed claim for a refund, and after such claim was disallowed, brought suit in the U.S. District Court for the Northern District of Mississippi. The District Court found that the "primary or

---

[4] Such imputation would also give petitioner current earnings, and make the dividends fully taxable in the hands of the shareholders.

principal purpose" of the distribution to the shareholders was tax avoidance and, accepting respondent's theory, held that gain from the sales in question was properly imputed to the corporation. Having so held on this issue, the District Court then went on to hold—since the corporation now had the requisite earnings and profits because of its gains on the sales—that Hines had received a taxable dividend in the amount of his share of the proceeds of the sales. *Hines* v. *United States*, 344 F. Supp. at 1266–1267. On appeal, the Fifth Circuit, while accepting the lower court's finding of tax avoidance, reversed the lower court on the ground that it had applied an incorrect legal theory—respondent's theory in the instant case—in deciding whether or not the sales income should be imputed to the corporation:

> Our reading of the applicable case law in this area convinces us that the District Court erred. We hold that the *sine qua non* of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in fact participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner, could the corporation be charged with earning the income sought to be taxed. Any other result would unfairly charge the corporation with tax liability for a transaction in which it had no involvement or control. [*Hines* v. *United States*, 477 F. 2d 1063 (C.A. 5, 1973).]

Under this standard, held the Fifth Circuit, the Government must lose, as it was the finding of the lower court that the corporation had not participated in the sales transactions either by negotiating the sales prior to the distribution, or by any post-distribution activities. *Hines* v. *United States*, 477 F. 2d 1063 (C.A. 5, 1973).

Thus, under the dictates of *Jack E. Golsen, supra* at 756–757, we too must reject respondent's theory and accept that of petitioner, as supported by the *Hines* decision of the Fifth Circuit.[5] On the basis of the facts before us, we are unable to make the type of finding required by the Fifth Circuit in order that the gain from the sales be imputed to petitioner. Petitioner did not enter into any agreements, oral or written, with other individuals or companies to sell the lands. It did not give an option to anyone covering the lands in question. After the March 30 distribution, the evidence is undisputed that all matters relating to the holding and sales of the lands were handled separately by the shareholders—first as a group, and then through the agency, whose bona fide existence is not contested. The fact that two of the three individuals who were given ultimate responsibility in the agency were the very same persons who had exercised dominant influence

---

[5] Because of the rejection of respondent's theory, we need make no finding as to the existence of a business or a tax-avoidance purpose in the distribution of the lands to the shareholders. *Hines* did not consider the possibility of imputation through the doctrine of the anticipatory assignment of income and we shall take up this question separately below.

over the affairs of petitioner is not, in itself, enough to demand an imputation of agency activities to petitioner:

While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. [*United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, 454–455 (1950).]

There were some discussions by petitioner with IP, the eventual buyer, in late 1965. However, it is our determination that these discussions were not of the type upon which a finding of corporate participation can be based. First, these discussions appear to have been entirely inconclusive. No agreements were reached relating to a sale, or to a price for the lands. IP did not even make an offer to petitioner concerning the lands. The most that can be said for the discussions is that IP, through timber cruises it took at the time of the discussions, became more familiar with the condition of the lands and of the timber thereon. Secondly, these discussions were carried on approximately 1 year before the competitive bidding process which resulted in IP buying the lands. This is not a case in which ongoing corporate negotiations are terminated, a new entity quickly created, and a sale rapidly effected between such new entity and the party which had been negotiating with the corporation. *Blueberry Land Co.* v. *Commissioner*, 361 F.2d 93 (C.A. 5, 1966), affirming 42 T.C. 1137 (1964) (2 weeks from termination of corporate role to the time of the sale); *Wichita Term. El. Co.* v. *Commissioner*, 162 F.2d 513 (C.A. 10, 1947), affirming 6 T.C. 1158 (1946) (2½ weeks); *Meurer Steel Barrel Co.* v. *Commissioner*, 144 F.2d 282 (C.A. 3, 1944), certiorari denied 324 U.S. 860 (1945), affirming a Memorandum Opinion of this Court (virtually simultaneously).

Finally, the issuance of the guidelines on October 8, 1966, represents an independent undertaking by the shareholders, through the agency, to determine for what price they would be able to sell the lands. The issuance of the guidelines, we think it can be assumed, was a substitute for further individual discussions which would otherwise have had to have been carried on if the lands were to be sold. While, as mentioned above, all of the parties to whom the guidelines were sent had some familiarity with the lands in question as a result of prior contacts, two of the more important provisions in any sales agreement, price and the terms of payment, had yet to be agreed upon. IP was eventually chosen as the party to whom to make the sale because it had offered approximately $15 more per acre than the only other bidder. There is no reason to suspect that had G–P offered a higher price, or had one of the other parties bid and offered a higher price that the sale would not have been made to such other company. Thus, we

find that it was through the competitive bidding process instituted by the agency that the sale of the lands to IP was accomplished.

The sale to Willie Welch for $8,000 took place some 6 months after the distribution to the shareholders. Since we have found that the petitioner entered into no agreements written or oral to sell the land to any party, and that no options were granted covering any of the lands, we find that it was the agency which made the sale to Welch.

Thus, we are unable to find in the case of either sale that "the corporation actively participated in the transaction that produced the income to be imputed * * * by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner." (*Hines* v. *United States*, 477 F.2d at 1069–1070.) The Fifth Circuit's imputed income theory (which we must adhere to under *Jack E. Golsen*, 54 T.C. at 756–757) thus does not support an imputation to petitioner of the gains from the sales of the lands.

We also find that the March 30 distribution to the shareholders was not an anticipatory assignment of income, and hence that no imputation can be allowed under that theory. Unlike the imputed-income theory, discussed above, which focuses on the role of the corporation, the doctrine of anticipatory assignment of income concentrates on the type of asset which the corporation is distributing to its shareholders. The doctrine covers assets which are essentially income or rights to income in the hands of the transferor, and which he is attempting to avoid having to recognize by transferring them prior to the time when actual recognition is demanded. *Helvering* v. *Horst*, 311 U.S. 112, 116 (1940) ; *Doyle* v. *Commissioner*, 147 F.2d 769, 772–773 (C.A. 4, 1945), affirming 3 T.C. 1092 (1944).

The doctrine, however, does not cover cases such as the instant case in which what has been transferred is an appreciated asset—not received or held as income by the transferor—the unrealized appreciation of which will result in income only in the event of a sale. In *Campbell* v. *Prothro*, 209 F.2d 331 (C.A. 5, 1954), the taxpayer, an individual who raised livestock for a living, made a gift of 100 head of calves to a charitable organization. Such calves were never physically separated from those calves in which taxpayer retained title, and within 1 month of the gift, taxpayer and the charity agreed to a common sale of their calves to a third party. The Commissioner asserted a deficiency, his position being that the gift of the calves had been an anticipatory assignment of income, and hence that the sales proceeds from the 100 calves should be imputed to the taxpayer. The Fifth Circuit rejected this position, however, and instead held : "If they [the calves] were not income in taxpayers' hands, their gift of them could not, in the present state of the law, result in the receipt

of income by them." *Campbell* v. *Prothro, supra* at 336. The fact that *Campbell* involved a gift to an unrelated third party, while the instant case involves a dividend to shareholders, does not make that case irrelevant to the situation before us. For the central focus of the anticipatory assignment of income doctrine is on the attempt of one, having received, or being about to receive income, to gain a benefit from such income and at the same time avoid a recognition. *Helvering* v. *Horst, supra* at 116–117. This taxpayer strategy would be as effectively accomplished by a dividend, as by a gift, were it not for the anticipatory assignment of income doctrine. A gift allows the transferor to fulfill a donative intent, and in the case of certain charitable gifts, obtain a deduction from his income tax. See sec. 170, I.R.C. 1954. A dividend enables the corporation to satisfy the clammerings of its shareholders for income from their investment, thus making such investment more attractive.[6] And, in the closely held situation, the recipients are more than likely to include the very directors who declared the dividend. That the *Campbell* court saw the similarity between a gift and a dividend under the anticipatory assignment of income doctrine can be seen in its approving citation of the following dictum, from a concurring opinion in *Commissioner* v. *First State Bank*, 168 F.2d 1004, 1011 (C.A. 5, 1948), a case involving a dividend:

> It is true that a corporation which is contemplating a sale of its property by which a gain will be realized may, before any thing is done by way of sale, decide to distribute the property in kind to its stockholders and escape taxation for the gain which it did not realize. * * *

*Campbell* v. *Prothro*, 209 F.2d at 335.[7]

We have consistently approved the holding and the reasoning of the court in *Campbell. Stuart A. Rogers*, 38 T.C. 785, 788–789 (1962); *Humacid Co.*, 42 T.C. 894, 913 (1964). The facts before us support our reaching a similar conclusion in the instant case. Petitioner, on March 30, surrendered title to the lands to its shareholders. At that time, and at all times up through the eventual sale of the lands in November, the lands represented merely appreciated property, not income.

Cases which have found an anticipatory assignment of income are clearly distinguishable from the one before us. In those cases, there

---

[6] The benefits derived by a corporation from dividends are described in the following manner by the Fifth Circuit in *Commissioner* v. *First State Bank*, 168 F.2d 1004, 1009 (C.A. 5, 1948), certiorari denied 335 U.S. 867 (1948), reversing 8 T.C. 831 (1947): "The payment of dividends to its shareholders was the enjoyment of its income. A body corporate can be said to enjoy its income in no other way. Like the 'life-rendering pelican,' it feeds its shareholders upon dividends. * * *"

[7] Other cases upholding the relevance of anticipatory assignment of income principles to corporate distributions include *United States* v. *Joilet & Chicago R. Co.*, 315 U.S. 44 (1942); *Wood Harmon Corp.* v. *United States*, 311 F.2d 918 (C.A. 2, 1963); *Jud Plumbing & Heating* v. *Commissioner*, 153 F.2d 681 (C.A. 5, 1946), affirming 5 T.C. 127 (1945).

was no necessity for a sale, or for any other significant effort by the transferee before income would have to be recognized.[8] In *Helvering* v. *Horst, supra,* for example, the transfer was of interest coupons from a bond owned and retained by the transferor. The transferee had only to wait for payment on the coupons, there was no necessity for a further sale for income to be produced. See also *Doyle* v. *Commissioner, supra* (assignment of an interest in a monetary recovery against the Government, after the Government's request for certiorari had been denied) ; *Williamson* v. *United States,* 292 F.2d 524 (Ct. Cl. 1961) (liquidation distribution of accounts receivable on contracts already fully performed). Here, as noted above, the shareholders had to effect a sale before the unrealized appreciation in the lands could become income.

In *Tatum* v. *Commissioner,* 400 F.2d 242 (C.A. 5, 1968), affirming 46 T.C. 736 (1966), a charitable contribution of crops received as rent by a landlord—the crops were later sold by the charity—was determined to be an anticipatory assignment of income. The court pointed out that, there, the crops represented "payment by the tenant for the use of the land." Thus, they were "rental income assets no less than money paid for the same purpose." *Tatum* v. *Commissioner, supra* at 247. The court made it clear, however, that it was in no way attempting to question the holding in *Campbell* v. *Prothro,* 209 F.2d 331 (C.A. 5, 1954). Had the taxpayers in *Tatum* received and held the crops as farmers, rather than as landlords, the court said, *Campbell* would be squarely in point and require a different result. *Tatum* v. *Commissioner, supra* at 245–247.[9] In the instant case, the lands were not held by the petitioner as rents, or as any other type of income. Hence, this case, as was *Campbell* v. *Prothro, supra,* is clearly distinguishable from the *Tatum* situation.

Respondent points out that the apartment house in *Commissioner* v. *Court Holding Co.,* 324 U.S. 331 (1945), affirming 2 T.C. 531 (1943), and the shares of stock in *Commissioner* v. *Transport Trad. & Term. Corp.,* 176 F. 2d 570 (C.A. 2, 1949), certiorari denied 338 U.S. 955 (1950), were both capital assets which had to be sold, or in the case of the apartment house, leased, before taxable income on their appreciation would be produced. However, in both those cases, respondent points out, the distributing corporations were taxed on the subsequent sales of these assets by their shareholders. Respondent's reliance on these cases to support the use of the anticipatory assignment doctrine in the instant case, however, is misplaced. In neither of those cases

---

[8] The facts of the case before us make it unnecessary to make a further distinction along the lines of the fruit-tree analogy. *Lucas* v. *Earl,* 281 U.S. 111 (1930).

[9] This distinction between the situation involved in *Tatum* and that in *Campbell* is expressly upheld in *Parmer* v. *Commissioner,* 468 F. 2d 705, 707 (C.A. 10, 1972), affirming a Memorandum Opinion of this Court.

did the courts hold that there had been an anticipatory assignment of income. Indeed, neither case even discussed the doctrine. In *Court Holding Co.*, a factual finding of the Tax Court that the corporation had in effect made the sale was the basis of the decision. *Court Holding Co.*, 324 U.S. at 333-334. We have determined that no such finding can be made here. In *Transport Trad. & Term. Corp.*, the court, while finding corporate participation in the sale, made its holding on the basis of the tax-avoidance intent of the transferor, 176 F. 2d at 572, a theory which the Fifth Circuit explicitly rejects in *Hines* v. *United States*, 477 F. 2d 1063 (C.A. 5, 1973), and which we must reject for purposes of our holding here. *Jack E. Golsen*, 54 T.C. at 756-757.

*Decision will be entered for the petitioner.*